**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**BARTON MINES COMPANY, L.L.C.,**

                **Plaintiff,**

  vs.                                         **1:14-CV-1003
                                                   (MAD/CFH)**

**RICKY MILLER,**

                **Defendant.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **BOND, SCHOENECK & KING, LLC**<br>111 Washington Avenue<br>Albany, New York 12210-2211<br>Attorneys for Plaintiff | **STUART F. KLEIN, ESQ.** |
| **COOPER, ERVING & SAVAGE, LLP**<br>39 North Pearl Street<br>Albany, New York 12207-2785<br>Attorneys for Defendant | **PHILLIP G. STECK, ESQ.** |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

      On August 1, 2014, Plaintiff commenced this action by filing a Summons and Complaint with the Warren County Clerk. *See* Dkt. No. 1-1. Defendant was served with the Summons and Complaint on or about August 9, 2014. In addition to the Summons and Complaint, Plaintiff also filed and served Defendant with an Order to Show Cause with Temporary Restraining Order. *See* Dkt. No. 1-1 at 36-38. On August 1, 2014, Supreme Court Judge David Krogmann granted Plaintiff's request for a temporary restraining order. *See id.*

Defendant removed the action to this Court on August 12, 2014 alleging complete diversity and an amount in controversy in excess of $75,000. *See* Dkt. No. 1. Thereafter, Plaintiff filed another motion for a temporary restraining order/preliminary injunction in compliance with the Local Rules and Defendant filed a motion to vacate the temporary restraining order. *See* Dkt. Nos. 5, 8. On August 21, 2014, the Court issued a text order setting a date for oral argument and extended the expiration date of the temporary restraining order until it could hear the parties' arguments on the pending motions. *See* Dkt. No. 10.

Currently before the Court are Plaintiff's motion for a temporary restraining order and Defendant's motion to vacate.

## II. BACKGROUND

Plaintiff Barton Mines produces garnet abrasives for waterjet cutting, coatings removal, surface preparation and other specialized applications. *See* Dkt. No. 1-1 at ¶ 3. "Simply stated, waterjets are industrial machine tools that cut all types of materials by harnessing the power of high pressure water and using it in a controlled fashion. The addition of abrasives to the water stream is necessary to be able to cut most materials." *Id.* at ¶ 4. Machines for the waterjet industry are supplied by a number of "Original Equipment Manufacturers" ("OEMs") and integrators that design, build and sell their equipment to industrial users. *See id.* at ¶ 5. A number of aftermarket suppliers also serve the market for replacement parts as well as other consumables such as garnet abrasives. *See id.* Barton Mines produces and sells garnet abrasives, as well as manufactures and sells replacement parts for waterjet cutting systems. *See id.*

On April 26, 2010, Defendant Ricky Miller commenced his employment with Barton Mines. *See id.* at ¶ 11. Defendant Miller was hired for the position of Regional Sales Manager

and, starting in 2011, he reported directly to William Flint, Barton's Vice President of Business Development. *See id.* at ¶ 12. Upon commencing his employment with Barton Mines, Defendant Miller executed an "Employee Confidentiality Agreement and Non-Competition Agreement" ("Employee Agreement"). The Employee Agreement contained the following provisions:

> [Miller] covenants and agrees that so long as [Miller] is employed by [Barton], and for a period of two (2) years after the date of termination of [Miller's] employment by [Barton], whether such termination is voluntary or involuntary, [Miller] will not enter into or engage in, or be employed by or associated with, an entity that is engaged in the marketing, sales or distribution of garnet abrasives and waterjet replacement parts, whether as an individual for [Miller's] own account, or as a partner, joint venture, employee, agent, independent contractor or sales representative, officer, director or shareholder of any entity or other wise, or in any manner compete with [Barton] without [Barton's] specific written consent to do so.
>
> * * * * *
>
> [Miller] covenants and agrees that when [Miller's] employment with [Barton] ends, whether voluntarily or involuntarily, [Miller] will not, for a period of two (2) years from the end of the employment relationship, directly or indirectly, solicit or attempt to solicit to do business that would compete with [Barton] in the marketing, sales or distribution of garnet abrasives and waterjet replacement parts.
>
> * * * * *
>
> [Miller] also agrees that, for a period of two (2) years from the end of the employment relationship, whether voluntary or involuntary, [Miller] will not, either individually or through any person, firm, corporation or other entity for which [Miller] performs services or in which [Miller] has any interest, solicit or attempt to solicit any then current employee of [Barton] to leave.

Dkt. No. 1-1 at ¶¶ 16-17.

On Thursday, July 10, 2014, Defendant Miller contacted Barton Mines to inform the company that he was resigning because he had accepted an offer of employment with another company. *See id.* at ¶ 43. Defendant Miller informed Barton Mines that he was going to work for

H2O Jet, which is part of Waterjet Holdings. *See id.* at ¶ 44. During this conversation, Defendant informed Barton Mines that he was going to be setting up distribution to sell H2O Jet's water pumps, as well as their waterjet parts. *See id.* at ¶ 45. Defendant also informed Barton Mines that his assigned territory was going to be everything west of the Mississippi River. *See id.* By letter dated July 14, 2014, Barton Mines advised Defendant of his continuing obligations under his Employee Agreement. *See id.* at ¶ 46.

On August 1, 2014, Plaintiff commenced this action seeking to enforce the Employee Agreement. Currently before the Court are Plaintiff's motion for a temporary restraining order and Defendant's motion to vacate the temporary restraining order issued by Judge Krogmann.

### III. DISCUSSION

**A.     Standard of review**

Under the federal framework, a TRO is "an extraordinary remedy never awarded as of right." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). In the Second Circuit, a movant for a TRO must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994) (citing *Jackson Dairy, Inc. v. H.P.Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1970)).

On the question of irreparable harm, "it has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue." *Jackson Dairy, Inc.*, 596 F.2d at 72 (citing *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir.1966)).

4

Nonetheless, federal case law does recognize that in certain circumstances "[a] threat to trade or business may constitute irreparable harm." *United Retail Inc. v. Main Street Mall Corp.*, 903 F. Supp. 12, 14 (S.D.N.Y. 1995) (citing a string of Second Circuit cases in support of this proposition). Such threats are typically found to be irreparable in cases where the defendant's actions are likely to wipe out the plaintiff's entire operation. *See id.*

B.  **Application**

In its motion for a temporary restraining order, Barton Mines argues that Defendant "had intimate knowledge of Barton's sales, pricing, customers and corporate strategy nationwide." Dkt. No. 5-1 at 7. Barton Mines contends that Defendant obtained such knowledge through the following:

> -Participation, twice a month, in Barton's national sales conference calls where every [Regional Sales Manager] discussed key account activities in their region.
>
> -Access to Barton's product costs, which were universal throughout all regions, so he could determine Barton's margin for the key accounts in every region. Miller was very well aware of the lowest margins that the company would accept.
>
> -Receiving detailed correspondence generated after national sales conference calls, which would go into detail about:
>
>> -Where Barton lost business, and why;
>>
>> -Barton's pricing versus the competitor's price;
>>
>> -Where Barton picked up new business;
>>
>> -The reasons why Barton [was] able to secure this new business; and
>>
>> -Barton and competitor pricing as it relates to new business.

> > -Attending Barton's Quarterly Communications meetings where Barton's Chairman, as well as all of Barton's Officers, discussed such topics as:
> >
> > > -Barton's sales and financial results for the quarter and YTD;
> > >
> > > -Key strategies for the company;
> > >
> > > -Confidential information regarding potential garnet deposits, potential mergers and acquisitions; and
> > >
> > > -Human resources information related to personal benefits, compensation, and other internal company policies.

*Id.* Barton Mines claims that "Miller, as a high level employee of Barton, had intimate knowledge of Barton's confidential, proprietary business information and trade secrets – information which is extremely important to Barton and which it takes great steps to protect." *Id.* Further, Barton Mines alleges that they "expended substantial financial resources through research, marking, travel, and entertainment to enable Miller – who had no experience or customers in the waterjet or blast media markets prior to his employment with Barton – to develop special relationships with Barton's customer base throughout the Northwest U.S. and in the Canadian Provinces west of Ontario (and, for a period of time, in Northern California and Northern Nevada)." *Id.* at 16.

Additionally, Barton Mines contends that the covenants at issue are reasonable in time, scope and area. *See id.* at 17-21. As to irreparable harm, Barton Mines argues that the loss of client relationships and customer good will built up over the years constitutes irreparable harm. *See id.* at 21-22. Barton Mines asserts that "a finding that Miller is unique, coupled with a finding that Barton and H2O Jet are competitors, is enough to establish irreparable harm." *Id.* at 22 (citing *Ticor*, 173 F.3d at 70). Finally, Barton Mines contends that the balance of equities weighs

6

in its favor because granting a temporary restraining order simply maintains the status quo. *See id.* at 24-25.

### *1. Likelihood of success on the merits*

In New York, "agreements that restrict an employee from competing with his or her employer upon termination of employment are judicially disfavored because 'powerful considerations of public policy . . . militate against sanctioning the loss of a [person's] livelihood.'" *Brown & Brown, Inc. v. Johnson*, 115 A.D.3d 162, 980 N.Y.S.2d 631, 637 (4th Dep't 2014) (quoting *Reed, Roberts Ass'c v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976)). "Therefore, no restrictions should fetter an employee's right to apply to his [or her] own best advantage the skills and knowledge acquired by the overall experience of his [or her] previous employment. This includes those techniques which are but 'skillful variations of general processes known to the particular trade.'" *Reed, Roberts Ass'c*, 40 N.Y.2d at 307 (quoting Restatement (Second) of Agency § 396 cmt. b)).

Despite New York's generally hostile attitude towards them, non-compete agreements may be enforceable, to at least some degree, when they are properly tailored to address legitimate business concerns. *See Brown & Brown, Inc.*, 980 N.Y.S.2d at 637 (quotation omitted). In other words, naked restraints are not enforceable, but restraints that are ancillary to a legitimate business purpose may be. *See id.* New York courts have therefore long applied a general "standard of reasonableness for judging the validity of such agreements . . . balancing the need of fair protection for the benefit of the employer against the opposing interests of the former employee and the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388 (1999); *see also Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[C]ourts must weigh the need to

protect the employee's legitimate concern regarding the possible loss of livelihood, a result strongly disfavored by public policy in New York").

In *BDO Seidman v. Hirshberg*, the New York Court of Appeals put this "reasonableness" standard into more concrete terms by holding that a non-compete agreement is reasonable "only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.* at 388-89 (emphases in original); *accord Reed, Roberts Ass'c, Inc. v. Strauman*, 40 N.Y.2d 303, 307 (1976) (reciting these same three factors). "A violation of any prong renders the covenant invalid," *id.*, although "overbroad restrictive covenants are partially enforceable 'to the extent necessary to protect [the employer's] legitimate interest.'" *Malcom Pirnie, Inc. v. Werthman*, 280 A.D.2d 934, 935 (4th Dep't 2001) (quoting *BDO Seidman*, 93 N.Y.2d at 394, 690 N.Y.S.2d 854, 712 N.E.2d 1220)). Further, even if a non-compete agreement is reasonable in light of each of the three factors set forth above, "a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area." *Reed, Roberts Ass'c*, 40 N.Y.2d at 307.[1]

In the present matter, both the non-compete clause and the non-solicitation clause are very broad in scope. The non-compete clause prohibits Defendant from being employed, in any manner whatsoever, by a business that engages in the "marketing, sales or distribution of garnet abrasives and waterjet replacement parts[.]" This clause, which prohibits such activities for a period of two years from the termination of his employment, would seemingly prohibit Defendant

---

[1] However, if a court finds that a non-compete agreement is overbroad, an employer is not entitled to partial enforcement as a matter of right. Partial enforcement may be justified only when "the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct," and shows instead that the employer "has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing." *BDO Seidman*, 93 N.Y.2d at 394.

from working for such an employer, in any capacity at all, regardless of whether his knowledge of the industry would be put to use. Additionally, the clause is not limited geographically, but would appear to apply to any company throughout the world in the waterjet and garnet abrasives industry. Similarly, the non-solicitation clause prohibits Defendant from "solicit[ing] or attempt[ing] to solicit to do business that would compete with [Barton] in the marketing, sales or distribution of garnet abrasives and waterjet replacement parts." This language appears to apply not only to Barton Mines' current customers, but to any entity who may eventually have need of waterjet or water pump replacement parts, or entities who are currently customers of Barton Mines' competitors. *See Brown & Brown, Inc.*, 115 A.D.3d 162, 980 N.Y.S.2d at 639-40 (holding that a "non-solicitation covenant is overbroad and therefore unenforceable 'if it seeks to bar the employee from soliciting or providing services to clients with whom the employee never acquired a relationship through his or her employment'") (quotation and other citation omitted).

Although the breadth of the agreements make it clear that Barton Mines is not likely to succeed on the merits as to enforcing the agreements as written, it may succeed in partial enforcement. In his affidavit, Mr. Rapple discussed the relationship between Barton Mines with Flow and OMAX, who manufacture products for the waterjet industry. *See* Dkt. No. 5-10 at ¶ 23. Barton Mines has supply and machine start-up agreements with these companies. *See id.* at ¶ 24. "As a result of these agreements, Barton has confidential and proprietary information on new waterjet machine installations, something which is not known in the industry." *Id.* Mr. Rapple contends that "[s]uch information provides Barton a list of potential customers where garnet abrasives and/or waterjet replacement parts may be needed – knowledge that Barton would not have but for such agreements." *Id.* Although the Court understands how such information would be beneficial to Barton Mines and its desire to keep this information confidential, Mr. Rapple also

indicated that Flow is now owned by the same parent company as H2O Jet, *i.e.*, Waterjet Holdings. *See id.* at ¶ 22. As such, Defendant's current employer, H2O Jet, may already have access to this "confidential" information regarding new waterjet machine installations, regardless of whether Defendant has somehow retained this knowledge.

At this stage, the Court finds that Plaintiff Barton Mines has failed to establish that they are likely to succeed on the merits. Although partial enforcement may be appropriate in this case, as the record currently stands, the Court is unable to make that fact-specific determination at this time. *See Brown & Brown, Inc.*, 115 A.D.3d 162, 980 N.Y.S.2d at 640-41.

### *2. Irreparable harm*

As discussed, Barton Mines offers "the only comprehensive line of high performance hard rock (HPX) and alluvial (HPA) garnet waterjet abrasives, as well as spare parts for waterjet cutting systems." Dkt. No. 5-10 at ¶ 5. H2O Jet, however, only engages in the business of manufacturing and selling waterjet replacement parts. According to Defendant's reply affidavit, the sale of waterjet parts constitutes only 10% of Barton Mines' total business, and only 3% of its business in Defendant's former territory. *See* Dkt. No. 17 at ¶ 4; *see also* Transcript of Hearing dated Sept. 2, 2014 ("Tr.") at 7-8. Such a small loss has been found not to constitute irreparable harm. *See Doldo Bros., Inc. v. Coors Brewing Co.*, No. 7:08-CV-206, 2008 WL 657252, *5 (N.D.N.Y. Mar. 7, 2008) (holding that sales loss of 3-5% and 10% do not constitute irreparable harm); *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 193 (S.D.N.Y. 1990) (holding that a loss of 10% of the distributors business does not constitute irreparable harm).

Further, in his sur-reply affidavit, Randolph Rapple, the President of Barton Mines, alleges that "Barton's ability to provide its customers <u>both</u> garnet abrasives and waterjet parts is

10

what makes Barton successful in the waterjet industry. Essentially Barton can provide its customers 'one stop shopping' to meet their waterjet needs." Dkt. No. 18 at ¶ 5 (emphasis in original). Since H2O Jet does not manufacture or sell garnet abrasives, Barton Mines will still be the only entity able to provide this "one stop shopping" experience.

Additionally, as discussed above, because of the recent acquisition of Flow and H2O Jet by the same parent company, the alleged confidential information which Barton Mines is seeking to protect is likely already available to Defendant's new employer. *See* Dkt. No. 5-10 at ¶¶ 22-25.

Barton Mines also argues that Defendant's training, which they provided, makes him unique, and thereby "threatens to undermine our sales and profitability in this market." *Id.* at ¶ 29. Barton Mines contends that Defendant was provided with substantial training at its expense to make him an industry expert. *See* Dkt. No. 5-1 at 6. In its complaint, Barton Mines "estimates that it takes approximately one year for a RSM to gain enough knowledge of Barton's products and markets to adequately manage their region. Based on this analysis, the cost to Barton to give Miller enough knowledge to work on his own, was approximately $170,000." Dkt. No. 1-1 at ¶ 31.

In *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999), a title insurance salesman was recognized as unique where he had worked nearly his entire professional career for the company, there were extensive negotiations with the employee's attorney concerning the terms of the non-compete, the employee was one of the highest paid sales representatives with his total compensation exceeding $1.1 million, and the employee received expense account reimbursements exceeding $150,000 annually. *See id.* at 66-67, 71. Yet, it was not just those reasons that determined the outcome. Rather, the court in *Ticor* appeared to be persuaded by the fact that the costs and terms of title insurance in New York are fixed by law, and the potential

client source was limited in scope. Therefore, under the circumstances, competition relied more heavily on personal relationships. *See id.* at 71.

In *Veramark Technologies, Inc. v. Bouk*, ___ F. Supp. 2d ___, 2014 WL 1364930 (W.D.N.Y. 2014), the plaintiffs argued that the defendant should be classified as a unique employee because he was the plaintiffs' highest ranking sales executive. *See id.* at *8. The plaintiffs contended that the defendant "served as Veramark's senior-most executive point of contact with key customers and channel partners and was privy to all information pertaining to the Company's customer relationships, sales strategies and business development efforts." *Id.* The defendant's base salary exceeded $157,000 with other unspecified benefits. *See id.* The plaintiffs also stated that the defendant spent "more than 50% of his working time out on the road" servicing their customers and "channel partners" and that he was "integral" in negotiating contracts with clients. *See id.*

Finding the plaintiffs' argument unconvincing, the court found the plaintiffs' "proof in this regard wholly insufficient to transform [the defendant] from an ordinary salesman into a unique employee." *Id.* (citing *Columbia Ribbon & Carbon Mfg. Co., Inc. v. A–1–A Corp.*, 42 N.Y.2d 496, 500, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977)). The court noted that the plaintiffs failed to offer any specific information concerning the defendant's compensation, other than his base salary, which "did not come close to the type of compensation recognized in *Ticor* as contributing to an employee's uniqueness." *Id.* Further, the court that the defendant traveling for his job for a significant portion of time did not make him unique, otherwise virtually all salesmen would be classified as unique for purposes of a restrictive covenant analysis. *See id.* Additionally, the court held that, while the plaintiffs contend "in a conclusory fashion that they invested substantial resources into [the defendant's] ability to develop customer relations, they offer no specifics, not

even disclosing the extent of any expense account that he may have used. [The defendant's] knowledge of the intricacies of the sales operation at Veramark, or even his status as its highest ranking sales executive, does not transform him into a unique employee for purposes of a restrictive covenant analysis." *Id.* (citing *Reed, Roberts Assoc., Inc. v. Strauman*, 40 N.Y.2d 303, 309, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976)).

In the present matter, the Court agrees with Defendant that Barton Mines has failed to establish for purposes of this motion that he is a unique employee. Defendant was a regional sales manager, who was paid a base salary of $90,000. *See* Dkt. No. 17 at ¶ 3. Barton Mines claims that, through their training, their regional sales managers become experts in the waterjet parts field, which is a "huge advantage that Barton has over its competition, and it is what differentiates a Barton salesperson from all other sales people who call on the waterjet operator." Dkt. No. 1-1 at ¶¶ 29-30. Although Barton Mines claims that this training cost it approximately $170,000, it provides nothing but conclusory statements to support this position. Additionally, as in *Veramark*, the Court has been provided with only the most basic information regarding Defendant's compensation, which is considerably lower than the defendant in *Veramark* and *Ticor*. Further, Barton Mines has not disclosed the extent to which Defendant had access to an expense account. Finally, Barton Mines has provided nothing more than conclusory assertions regarding the limited potential customer base.

Based on the foregoing, the Court finds that Barton Mines has failed to establish that it will suffer irreparable harm.

**C. Defendant's motion to vacate the state court's discovery order**

In an order dated August 1, 2014, the state court directed Defendant to produce and permit

13

inspection of the following:

> 1. Your home computer(s), as well as any other computer you may have used since your termination of employment with Barton Mines Company, L.L.C., PDA devices, external hard drives or zip drives for forensic copying of the data contained therein.
>
> 2. Any documents exchanged by and between you and H2O Jet or any related H2O Jet entity (including employees).
>
> 3. Your offer letter with H2O Jet (or official employer), Employment Agreement, Confidentiality Agreement, Non-Disclosure Agreement, Job Description or any other documents setting forth your duties, responsibilities and expectations at your current position with H2O Jet (or official employer).

Dkt. No. 1-1 at 40-41.

The Court agrees with Defendant that this order is extremely broad in scope and that Barton Mines failed to come forward with any non-conclusory allegations regarding the alleged confidential information that Defendant has. Although Barton Mines may be entitled to some of the information it seeks, the current order permits it to engage in nothing more than a fishing expedition. *See Spiteri v. Russo*, No. 12 CV 2780, 2012 WL 5289586, *8 (E.D.N.Y. Oct. 19, 2012); *Evans v. Calise*, No. 92–CV–8430, 1994 WL 185696 (S.D.N.Y. May 11, 1994) ("The party seeking the discovery must make a prima facie showing, that the discovery sought is more than merely a fishing expedition") (citations omitted).

Based on the foregoing, the Court vacates the production order. Barton Mines may reapply to the assigned Magistrate Judge for the relief they seek. Although the Court is vacating this order, the Court orders that, pending resolution of this matter and a determination of whether Barton Mines is entitled to inspect, Defendant is prohibited from deleting or allowing to be deleted any data on his computer or PDA devices (*e.g.*, IPhone, IPad, Droid, etc.) regarding his employment with Barton Mines.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for a temporary restraining order (Dkt. No. 5) is **DENIED**; and the Court further

**ORDERS** that Defendant's motion to vacate the temporary restraining order (Dkt. No. 8) is **GRANTED**; and the Court further

**ORDERS** that Defendant is prohibited from deleting or allowing to be deleted any data on his computer or PDA devices (*e.g.*, IPhone, IPad, Droid, etc.), or any emails regarding his employment with Barton Mines pending the resolution of this matter; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 9, 2014
       Albany, New York

                                      Mae A. D'Agostino
                                      U.S. District Judge